# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | |
|---|---|
| **TONY THEDFORD** | **CASE NO. 3:19-CV-1120** |
| **VERSUS** | **JUDGE S. MAURICE HICKS, JR.** |
| **ANDREW SAUL, COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Tony Thedford filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on August 18, 2017.   (Tr. 10, 160-172).   He alleged disability as of August 8, 2017, because of depression, paranoia, and bipolar disorder. (Tr. 184, 188).   The state agency denied the claims at the initial stage of the administrative process.   (Tr. 64-97, 100-103).   Thereafter, Thedford requested and received an August 14, 2018, hearing before an Administrative Law Judge ("ALJ").   (Tr. 27-63).   However, in a September 19, 2018, written decision, the ALJ determined that Thedford was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that he was able to return to past relevant work, or alternatively at step five, that he could make an adjustment to work that exists in significant numbers in the national economy.   (Tr. 7-23).   Thedford sought review of the adverse decision before the Appeals Council.   On July 1, 2019, however, the

Appeals Council denied Thedford's request for review; thus, the ALJ's decision became the final decision of the Commissioner.   (Tr. 1-3).

On August 26, 2019, Thedford sought review before this court.   He asserted several assignments of error, as follows:

1.   The ALJ committed reversible error by failing to recognize that plaintiff's mental impairments met or equaled the criteria in the list of impairments described in 20 C.F.R., Part 404, Subpart P, Appendix 1- specifically §§ 12.05B and 12.11.

2.   The ALJ's residual functional capacity assessment is not supported by substantial evidence; and

3.   The ALJ's findings at steps four and five are tainted by legal error because she failed to resolve apparent conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles as required by Social Security Ruling 00-4p.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.   *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).   Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).   The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards.   *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).   Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401.   Substantial evidence lies somewhere between a scintilla and a preponderance.   *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).   A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).   The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of

2

the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.   *See* 42 U.S.C. § 423(a)(1)(D).   The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."   42 U.S.C. § 423(d)(1)(A).   Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.   *See* 42 U.S.C. § 423(d)(2)(A).   Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.   *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.   *See* 20 C.F.R. §§ 404.1520, 416.920.   The steps are as follows,

(1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)   An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)   If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

> (5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).   When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.   *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.   *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

### I.     Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that, despite some attempts at work, the claimant had not engaged in substantial gainful activity since the alleged disability onset date.   (Tr. 12-13).   At step two, she found that the claimant suffers from severe impairments of depression, anxiety, learning disorder, and alcohol abuse.   (Tr. 13).[1]   She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 13-16).

### II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity

---

[1] The ALJ determined that plaintiff's medically determinable impairments of GERD and obesity were non-severe.   *Id.*

("RFC") to perform work at all exertional levels, except that he was limited to understanding, carrying out, and remembering two-to-three step tasks; making simple work-related decisions or judgments; tolerating few workplace changes; sustaining attention for up to two-hour blocks of time; being off task up to ten percent of the time, which could be accommodated by normal breaks and lunch; only occasionally able to interact with supervisors and coworkers and unable to work in proximity to supervisors or coworkers because he was easily distracted; plus he was unable to interact with the public.   (Tr. 16-21).

## III.    Steps Four and Five

At step four, the ALJ employed a vocational expert ("VE") to find that Thedford was able to return to his past relevant work as a janitor, both as he actually performed that job, and as it is generally performed in the national economy.   (Tr. 21, 58).[2]

The ALJ also proceeded to make an alternative step five finding.   At this step, the ALJ determined that the claimant was a younger individual (34 years old on the alleged disability onset date), with a limited education, and the ability to communicate in English.   (Tr. 22-23). Transferability of skills was not material to the decision.   *Id.*

The ALJ then observed that given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.   20 C.F.R. § 404.1569; Rule 204.00, Tr. 22-23. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent the additional limitations eroded the occupational base for work at all exertional levels.   *Id.*   In response, the VE identified the representative jobs

---

[2]  Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'" *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

of laundry laborer, *Dictionary of Occupational Titles* ("DOT") Code # 361.687.018; silver wrapper, DOT # 318.687-018; and table worker, DOT # 739.687-182, that were consistent with the ALJ's RFC and the claimant's vocational profile.   (Tr. 22, 58-59).[3]

### Non-Exhaustive Chronology of Relevant Medical Evidence

On July 13, 2016, Thedford was seen by Rajiv Narula, M.D.   (Tr. 243-245).   He reported acid reflux discomfort that was worse with alcohol and spicy foods.   *Id*.   His mood and affect were appropriate.   *Id.*   Dr. Narula advised Thedford to avoid ETOH, and to cease tobacco use.   *Id.*

On July 22, 2016, Thedford saw Stephen Baker, Jr., M.D., for an upper respiratory infection.   (Tr. 240-242).   He presented with left-sided pleuritic chest pain for the past four hours.   *Id.*   He described his pain as a 10/10.   *Id.*   He was negative for behavioral problems and had a normal mood and affect.   *Id.*   Dr. Baker diagnosed intercostal muscle strain and chest wall pain.   *Id.*

On September 15, 2016, Thedford saw Renee Tassin, M.D., for Gastroesophageal Reflux Disease ("GERD").   (Tr. 245-249).   He reported that his GERD treatment helped his symptoms except when he ate certain spicy food.   *Id.*   He described a depressed mood without sleep difficulty.   *Id.*   He earned half of what he used to and had separated from his wife.   *Id.*   He was positive for dysphoric mood, but negative for suicidal ideas and hallucinations.   *Id.*

Plaintiff returned to Dr. Tassin on December 1, 2016, where he reported that his current

---

[3]  The VE responded that for the laundry laborer, silver wrapper, and table worker jobs, there were 321,283, 106,199, and 424,103 positions, respectively, available nationally.   (Tr. 58-59).   This incidence of work constitutes a significant number of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

treatment had alleviated all of his symptoms including when he ate spicy food.   (Tr. 249-252).
He had a normal mood, affect, and behavior.   *Id.*

On March 16, 2017, plaintiff saw Julie Chun, M.D., for complaints of depression.   (Tr.
252-254).   Thedford explained that he had tried to manage his symptoms on his own for the past
year, but now he needed more help because of significant stressors at home.   *Id.*   He reported
that he had been drinking more with a recent DWI.   *Id.*   He was positive for difficulty sleeping,
anhedonia, feelings of guilt, decreased energy, and decreased concentration.   *Id.*   He was
nervous/anxious.   *Id.*   However, Thedford's speech, judgment, and thought content were
normal.   *Id.*   Although he was withdrawn, he was not agitated or aggressive.   *Id.*   Cognition
and memory were normal.   *Id.*   He exhibited a depressed mood.   *Id.*   Dr. Chun diagnosed a
moderate, single current episode of major depressive disorder and prescribed Wellbutrin.   *Id.*

On August 4, 2017, plaintiff underwent a biopsychosocial assessment at Autumn Creek
Health Solutions and was diagnosed with major depressive disorder, recurrent, severe;
generalized anxiety disorder; and alcohol use disorder, severe.   (Tr. 261-274).   Thedford
reported that he had been experiencing symptoms of depression, anxiety, and alcohol
consumption since 2010.   *Id.*   He had had an increase in alcohol intake (hard liquor daily),
depressed mood, anxiety level, and grief issues for the past four months.   *Id.*   He had a long
history of poor interpersonal relationships.   *Id.*   He was raising two daughters on his own.   *Id.*
He felt emotionally drained.   *Id.*

Plaintiff denied any history of substance abuse/treatment.   *Id.*   However, he was
drinking hard liquor currently as a coping skill.   *Id.*   He was a high school graduate.   *Id.*   His
developmental milestones were within normal limits.   *Id.*   He did not report receiving any
special services.   *Id.*   He had a history of suicidal ideation, without a plan.   *Id.*   He was

oriented, with average insight and judgment.  *Id.*   However, he was irritable and depressed.  *Id.*

Thedford appeared anxious and distracted because of news that he had been suspended from

work.  *Id.*   He reported severe anxiety and depression for up to the past six months.  *Id.*   He

also reported moderately poor interpersonal skills.  *Id.*   One of the things that plaintiff liked

about himself was his ability to work.  *Id.*   His abilities included reading, writing, and the

capacity to work.  *Id.*   His problem areas included depression, anxiety, alcoholism, and poor

coping skills.  *Id.*   In fact, plaintiff poured himself an alcoholic drink during the assessment.

*Id.*   There were no medical issues reported.  *Id.*   His treatment goal was to reduce frequency

and duration of anxiety, so his daily functioning was not impaired.  (Tr. 275).

On August 7, 2017, plaintiff was seen by Jaclyn Pillay, M.D.  (Tr. 255-257).   He

generally was pleased with the effects of his Wellbutrin.  *Id.*   He had had some outbursts of

anger because of family stress.  *Id.*   However, he had signed up for counseling with his

daughters.  *Id.*   He was on leave from work after having a loud argument with a co-worker.  *Id.*

A depression screen showed moderately severe symptoms.  *Id.*

Thedford returned to Dr. Pillay on September 7, 2017, with complaints of insomnia.  (Tr.

364-370).   He reported that he was feeling much better on Wellbutrin, and no longer had

feelings of depression.  *Id.*   Furthermore, he had removed the "black out" curtains from his

windows.  *Id.*   However, he did not trust his counselor from Autumn Creek.  *Id.*   He also

reported that he could not sleep at night because he thought people were coming for him.  *Id.*

He had lost two jobs over the past two months because he believed that his employers were out

to get him.  *Id.*   He denied audio-visual hallucinations.  *Id.*   He could not keep employment

because of his paranoia.  *Id.*   Dr. Pillay referred him to psychiatry.  *Id.*

On September 20, 2017, non-examining agency physician, Hollis Rogers, M.D.,

reviewed the record and opined that Thedford did not have any severe physical impairments. (Tr. 88-89).

Plaintiff again saw Dr. Pillay on November 8, 2017.  (Tr. 380-386).   He no longer saw his counselor from Autumn Creek because he did not trust him.  *Id.*   However, he was trying to find a different counselor.  *Id.*   He continued to experience paranoia, and still could not maintain employment because of paranoia and outbursts.  *Id.*   He reported improvement with his rest and sleep habits.  *Id.*   In addition, he stated that he had ceased ETOH and tobacco use. *Id.*

At the request of the state agency, Thedford underwent a November 11, 2017, consultative mental status examination administered by licensed clinical psychologist Susan Tucker, Ph.D.  (Tr. 280-287).   Thedford arrived at the appointment accompanied by his friend. *Id.*  He did not have a valid driver's license because of a prior DWI.  *Id.*   His posture, gait, and fine motor skills all appeared to be within normal limits.  *Id.*   His speech was within below normal limits with 90% understood, and presenting with mild articulation errors.  *Id.*   He exhibited adequate effort and good cooperation during the interview.  *Id.*   His behavior was appropriate.  *Id.*   His sleeping patterns were within normal limits with his medication, but otherwise it was difficult for him to sleep.  *Id.*   He reportedly kept aluminum foil over his house windows because he was paranoid that people were watching him.  *Id.*   He could hear the voice of his deceased friend telling him to come to the lake to drown himself.  *Id.*   Other than GERD, he reported no remarkable medical concerns.  *Id.*   He had no history of substance abuse.  *Id.* He also denied tobacco and alcohol use.  *Id.*   He stated that he used to drink until he was prescribed his current medication.  *Id.*

His alleged conditions included depression, paranoia, and anxiety.  *Id.*   The information

Thedford provided appeared to be accurate and valid. *Id.* His wife had left him with two daughters about one year earlier. *Id.* His parents were both deceased. *Id.* He attended North DeSoto High School where he dropped out in the ninth grade. *Id.* He reported that all of his classes were special education. *Id.* He had a pattern of behavioral/disciplinary concerns in a school setting. *Id.* His progress in reaching developmental milestones was unknown. *Id.* He currently was prescribed Buspar, Trazodone, and Protonix. *Id.* He was compliant with his medication, but unsure whether he received a positive result. *Id.* He reported that he had been depressed and suicidal for the past five years. *Id.* He also reported difficulty with short-term memory and focusing. *Id.* His ability to perform academic/work-related activities was minimal. *Id.* He was able to manage his activities of daily living alone. *Id.* However, he required emotional support. *Id.* His level of social interaction and social skills were poor. *Id.* He had minimal friends and an inactive social life. *Id.* His ability to complete tasks timely and appropriately was minimal. *Id.* His ability to adapt also was minimal. *Id.* He was unable to recall a simple sentence and unable to complete a complex sentence. *Id.* He had difficulty with sustained concentration, short-term memory, and staying focused. *Id.* He also had difficulty understanding approximately 40% of the instructions. *Id.* He appeared to have fair judgment, but minimal insight. *Id.* Assessment of cognitive functioning yielded a profile that appeared to be valid. *Id.* He obtained a full-scale IQ score of 55 which fell within the mild range of intellectual functioning and placed him within the .1 national percentile compared to others. *Id.*

Tucker diagnosed intellectual disability - mild, depression with psychosis, anxiety, paranoia, and mood disorder. *Id.* Thedford's prognosis appeared to be marginal. *Id.* He had poor ability for understanding, remembering, and following through with simple repeated

instructions. *Id.* He would have difficulty carrying out complex instructions without support. *Id.* He would have minimal ability for maintaining attention and performing simple work-related tasks for a two-hour block. *Id.* His ability to sustain effort and persist at a normal course of a routine workweek schedule with success was poor with support. *Id.* He would have difficulty with authority figures and peers in a work setting. *Id.* His ability to handle the stress, pressure, and social environment of the work setting was poor due to his mental impairments. *Id.* He had minimal ability to sustain concentration and persistence. *Id.* Finally, he had a penurious level of social interactions and social skills. *Id.*

On November 16, 2017, plaintiff was seen by psychiatrist Swathi Parvataneni, M.D. (Tr. 399-402). Thedford stated that he was there for his depression and paranoia. *Id.* He reported that within the past few months, his depression had been worsening. *Id.* He stated that he had been jailed for three months on false charges. *Id.* His mother was a drug addict, and his grandmother never liked him. *Id.* He explained that he felt hopeless, less energetic, and had a low mood. *Id.* He had decreased sleep and difficulty concentrating. *Id.* He heard voices from his friend and mother who told him to drown himself. *Id.* He slept for about seven hours with a sleeping aid. *Id.* He had a tenth-grade education and special education. *Id.* His insight and judgment were fair. *Id.* His attention and concentration were good. *Id.* He denied audio/visual hallucinations. *Id.* Parvataneni diagnosed major depressive disorder, moderate, with psychosis. *Id.* He added that Thedford would benefit from therapy sessions. *Id.*

On November 20, 2017, non-examining agency psychologist, Cathy Word, Ph.D., reviewed the record, and opined that although plaintiff' mental impairments were severe, they did not meet or equal a listing. (Tr. 89-92). In so finding, Dr. Word noted that the IQ test

results obtained by Dr. Tucker were not consistent with plaintiff's work history, the fact that he completed his disability forms on his own, and other treatment records.   *Id.*   Dr. Word emphasized that while plaintiff might experience learning difficulties, this impairment did not interfere with his past or current ability to perform simple work.   *Id.*

Dr. Word also completed a mental residual functional capacity assessment.   (Tr. 92-95). She opined that Thedford's ability to understand, remember, carry out very short and simple sentences was not significantly limited.   *Id.*   However, his ability to understand, remember, and carry out detailed instructions was markedly limited.   *Id.*   Also, his ability to maintain attention and concentration for extended periods was moderately limited.   *Id.*   She further opined that plaintiff could sustain attention for up to two-hour blocks of time when performing simple and routine work-related tasks, and that he could make simple work-related decisions.   *Id.*   As for social interaction, Dr. Word believed that Thedford would have significant difficulty dealing effectively with the general public, but could relate to them on a limited basis.   *Id.*   In addition, he could be around co-workers and supervisors in non-confrontational situations and accept respectful supervision, with constructive criticism.   *Id.*   Thedford would function best in standardized work environments with minimal variation.   *Id.*   Word summarized that Thedford retained the capacity to perform at least simple tasks containing one-to- two steps in a standardized work environment with minimal variation and limited social contact.   *Id.*

On December 12, 2017, plaintiff saw Jennifer O'Neal, M.D.   (Tr. 417-420).   According to plaintiff, the pharmacy would not fill his prescriptions.   *Id*.   Therefore, for the past three weeks he had been off his psychiatry medication.   *Id.*   His mood was low, and he was not sleeping well.   *Id.*   Dr. O'Neal remarked that all of Thedford's medication should have been covered under Medicaid.   *Id.*

On December 28, 2017, plaintiff returned to Dr. Parvataneni.  (Tr. 435-438).   Thedford appeared to have personality traits or disorder, but his history was insufficient to make that determination.  *Id.*  Plaintiff reported that he was "just ok."  *Id.*  His daughter was doing well in school.  *Id.*  Sometimes he felt depressed, but he was trying to cope with it.  *Id.*  He was seeing a counselor once per week.  *Id.*  He was looking into jobs and had submitted applications.  *Id.*  He was motivated to work because of his bills.  *Id.*  He stated that his kids helped each other out with their homework and did well in school.  *Id.*  He said that there were a couple of instances where he was paranoid and tried to avoid people.  *Id.*  However, he did not have difficulty concentrating.  *Id.*  His sleep was good with his current medication.  *Id.*  His attention and concentration were good, and his cognition was grossly intact.  *Id.*

Plaintiff saw Dr. Parvataneni again on May 2, 2018.  (Tr. 446-448).[4]  He stated that he was not doing well.  *Id.*  He recently had lost his job after getting into a physical altercation with a co-worker.  *Id.*  He thought people were talking behind his back.  *Id.*  He had stopped taking his medication and relapsed with symptoms.  *Id.*  He also had been evicted because he could not pay his bills.  *Id.*  His daughters were staying with his sister.  *Id.*  He admitted that he did better when he was on his medication.  *Id.*  His sleep was not good, but he had no difficulty concentrating.  *Id.*  He remained preoccupied with filing his disability paperwork.  *Id.*  His mood was "not good."  *Id.*  However, his cognition was grossly intact, and his insight/judgment were good.  *Id.*

---

[4]  Although the treatment note references a January 23, 2018, visit, that record appears to be missing.

**Analysis**

## I.    Step Three

To establish that a claimant's injuries meet or medically equal a listing, the claimant must provide medical findings that support all of the criteria for a listed impairment (or most similarly listed impairment).    *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).    In determining whether a claimant's impairment(s) equals a listing, all evidence in the case record about the claimant's impairments and their effects are considered.    20 C.F.R.    § 404.1526(c).    An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify.    *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).    If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present.    *Selders*, 914 F.2d at 620.

Plaintiff initially contends that he meets listing § 12.05B, which requires, *inter alia*, significantly subaverage general intellectual functioning demonstrated by specific IQ scores.    20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.05B.    In support, plaintiff cites the full-scale IQ score of 55 that he obtained on a test administered by Dr. Tucker.    Plaintiff maintains that the ALJ never rejected the validity of that test, which Dr. Tucker considered to be valid.    However, while the ALJ did not question the validity of the IQ test in her step three analysis, she specifically stated in her RFC discussion that she did not accept the IQ scores because they were based on plaintiff's subjective reports, which were inconsistent with his work history and other statements in the record.    (Tr. 20).    Indeed, contrary to his representations to Dr. Tucker, plaintiff told Autumn Creek that he graduated from high school, and that his developmental milestones were within normal limits.    (Tr. 261, 264).    He also did not report receiving any special services.    *Id*.

14

The ALJ is permitted to resolve these factual disputes, and to make factual determinations regarding the validity of IQ tests.  *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir.1991).

The ALJ's decision to discount the validity of Dr. Tucker's IQ testing is further buttressed by Dr. Word's opinion that, for basically the same reasons noted by the ALJ, the test scores were invalid.   Moreover, the regulations expressly permit the state agency psychological consultant to make such a determination so long as it is well-supported.   20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00H(2)(d).   In this case, Dr. Word's finding satisfies that requirement. At minimum, the jobs that plaintiff was able to perform in the past were not consistent with the IQ test results.

More problematic, however, is the ALJ's disposition of listing § 12.11, which requires both the A and B paragraphs to be satisfied, i.e., medical documentation of A . . . frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks . . . AND B. extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:   1. understand, remember, or apply information; 2. interact with others; 3. concentrate, persist, or maintain pace; 4. adapt or manage oneself.   20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.11.

Here, the ALJ did not discuss the requirements for paragraph A.   However, she found that plaintiff did not meet the listing because he had no more than a "moderate" limitation of functioning in all four of the paragraph B criteria.   Under the regulations, a "moderate" limitation is defined as "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."   20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00F(2)(c).   A "marked" limitation means that the claimant's ability to function in that area is "seriously" limited, whereas an "extreme" limitation means that the claimant is unable to function in that area.   *Id*., at § 12.00F(2)(d) and (e).

The ALJ stated that her RFC reflected the degree of limitation that she had found in her paragraph "B" mental functioning analysis.   (Tr. 15).   However, in her RFC, the ALJ imposed severe limitations of functioning such that plaintiff could never interact with the public, only occasionally interact with supervisors and coworkers, but unable to work in proximity to supervisors or coworkers because he was easily distracted.   To the court, these represent "serious" limitations, which plainly contradict the ALJ's step three finding that plaintiff's ability to interact with others remained "fair."   Moreover, when plaintiff was off his medication, it appears that his ability to function in this area may be "extremely" compromised.

In her RFC, the ALJ also limited plaintiff to understanding, carrying out, and remembering 2-3 step tasks; making simple work-related decisions or judgments; with few workplace changes.   Again, these limitations appear to be more consistent with a "serious" limitation in the corresponding area of functioning, rather than retention of a "fair" ability to perform these activities.

In short, the ALJ's RFC is not consistent with her more benign "paragraph B" findings at step three.   To the contrary, the RFC limitations suggest that plaintiff's mental impairments meet the "paragraph B" criteria.   Furthermore, there is evidence in the record to indicate that plaintiff also might satisfy "paragraph A" of § 12.11.   The ALJ, however, did not make any findings regarding "paragraph A" of § 12.11.   Remand is required.[5]

## II.    RFC

In her decision, the ALJ reviewed the available evidence, including the hearing

---

[5]   An ALJ's failure to adequately explain her step three determination does not require remand unless it affects the claimant's "substantial rights."    *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).   A claimant's substantial rights are affected at step three when she demonstrates that she meets, or at least appears to meet, the requirements for a listing.   *See Audler, supra*.

testimony, plaintiff's activities of daily living, available treatment records, the impression of the consultative psychologist, and the assessment of the non-examining agency.   (Tr. 16-21).   In deriving plaintiff's RFC, the ALJ resolved the opinion evidence by finding that the opinion of the consultative psychologist, Dr. Tucker, was "not persuasive," whereas the opinion of the agency psychologist, Dr. Word, was "persuasive."   *Id*.[6]   Plaintiff contends that the ALJ failed to provide good cause for discounting Dr. Tucker's opinion.

"[T]he ALJ is free to reject the opinion of any physician [or psychologist] when the evidence supports a contrary conclusion."   *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).   However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.   *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

Here, the ALJ endeavored to discount Dr. Tucker's opinion because it was based on plaintiff's subjective reports, which were inconsistent with the totality of the medical record – much of which Dr. Tucker was not privy to.   While the record contains contradictory statements from plaintiff regarding some of the material facts that he disclosed to Dr. Tucker, and plaintiff's treating psychiatrist(s) seemed to indicate less severe symptoms, at times, it is manifest that the ALJ essentially opted to credit the findings of the non-examining agency psychologist over the opinion of Dr. Tucker.   The difficulty with this approach is that an opinion from a non-examining provider does not provide good cause for an ALJ to discount the findings of an examining provider.[7]   *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's

_____

[6]  The ALJ also assigned "persuasive" weight to Dr. Rogers' opinion that plaintiff had no severe physical impairment.   (Tr. 20).   Plaintiff does not challenge the ALJ's resolution of the effects of plaintiff's physical impairments, and neither does the court.

[7]  A notable exception to this rule, of course, is that the agency psychological consultant can

reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician."   *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990) (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).   Here, Dr. Word's findings plainly are contradicted by Dr. Tucker's examination results.   While later treatment notes from plaintiff's psychiatrist(s) might serve to indicate less significant limitations of functioning, the psychiatrist(s) did not complete a medical source statement that contemplated a function-by-function assessment of the effects of plaintiff's mental impairments.   Moreover, like Dr. Tucker, Dr. Word was not privy to much of the later-produced treatment notes, and thus, her opinion could not have been formed by those records.

Even if the ALJ could have relied on Dr. Word's impressions to ground her RFC, the ALJ strayed from Dr. Word's assessment in at least two potentially material respects.   First, the ALJ found that plaintiff retained the ability to understand, carry out, and remember *two-to-three* step tasks, whereas Dr. Word found that he could only perform *one-to-two* step tasks.   Dr. Word also appeared to limit plaintiff to non-confrontational situations with his co-workers, including respectful supervision and constructive criticism.   The ALJ, however, omitted these additional limitations, without explanation.

In sum, the ALJ endeavored to ground her RFC regarding the effects of plaintiff's mental impairments on the opinion of the non-examining agency psychologist.   However, that

reject the validity of IQ test results.   *See* discussion*, supra*.

assessment was contradicted by the findings of the consultative psychologist, and, in any event, the ALJ failed to incorporate all of the limitations recognized by the agency psychologist.   The remaining record is devoid of a valid medical source statement that parallels the ALJ's RFC. Moreover, plaintiff's own testimony was not consistent with the ALJ's RFC.   *See* Tr. 194-198. Under these circumstances, the court is compelled to find that the ALJ's assessment is not supported by substantial evidence.   *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995) (substantial evidence lacking where:   no medical assessment of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

## III.    Steps Four and Five, plus Remand

Because the foundation for the ALJ's steps four and five determinations were premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.[8]

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

---

[8]   The court need not address the remaining assignment of error.   Upon remand, plaintiff may ensure that the ALJ fulfills her duty to elicit an explanation in the event of any inconsistencies between the vocational expert's testimony and the *Dictionary of Occupational Titles*.

Security, with or without remanding the cause for a rehearing.   42 U.S.C. '405(g).   When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.   *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.   Plaintiff's residual functional capacity assessment remains indeterminate.   Upon remand, the Commissioner may seek to obtain a medical source statement from plaintiff's treating psychiatrist(s) and/or obtain a new consultative mental status examination with associated medical source statement.   It also may become necessary to consider whether plaintiff's failure to take his prescribed medication materially affects his disability, and, if so, whether there is good cause for this omission.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[9]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within

---

[9]   The court need not consider plaintiff's additional arguments.   These issues may be addressed upon remand.

**fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 19th day of May 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE